* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillips and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. The Full Commission adopts the Opinion and Award of Deputy Commissioner Phillips with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. It is stipulated that the parties are subject to the North Carolina Workers' Compensation Act, defendant employing the requisite number of employees to be bound under the provisions of said Act at the time of the alleged accident. *Page 2 
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. An employment relationship existed between plaintiff and defendant on April 28, 2005, the date of the alleged accident.
4. Plaintiff contends that she suffered an injury by accident to her right shoulder on April 28, 2005. Defendants formally denied the compensability of plaintiff's claim via Form 61 dated May 9, 2005.
 * * * * * * * * * * *
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. On April 28, 2005, plaintiff had been employed by defendant for approximately 2 ½ weeks. Prior to that she had worked for defendant through a temporary agency, Adecco, since September of 2004.
2. Plaintiff was employed by defendant as a distribution associate in the warehouse. Plaintiff testified that her job duties included unloading trucks/containers, putting up stock, pulling orders, and shipping out orders. Trucks and containers that needed to be unloaded came in once or twice per week, and they had to be unloaded in two hours so that defendant would not be penalized. Plaintiff and others in her position, would spend approximately three to four days out of each week performing tasks other than unloading containers, and those tasks included putting up stock, pulling orders, and unloading containers. Any distribution associate would be called upon to pull orders from any section of the warehouse, including the overflow section. Pulling orders consisted of retrieving various items from boxes stored in the warehouse. *Page 3 
Because the boxes are stacked several feet high, an employee might have to reach up to retrieve the boxes from which items would be taken.
3. On April 28, 2005, plaintiff was pulling an order from the overflow section of defendant's warehouse. She picked up a box of jackets weighing approximately thirty pounds to put it on top of a pallet. As she extended her arms, she heard a pop in her right shoulder. Plaintiff filed a workers' compensation claim, and defendants filed a Form 61 denying the claim.
4. On April 29, 2005, plaintiff visited Caswell Family Medical Center where she was examined by Dr. Victoria Johnson. Plaintiff reported that she was putting a box on a pallet when she heard something pop in her right arm. She complained of pain in her right collarbone and shoulder, and she said her arm felt hot and that she could feel "the bone sticking out." Dr. Johnson diagnosed plaintiff with a "lifting injury" and a probable strain or first-degree tear in the AC joint. She instructed plaintiff to rest her arm and use a sling for support. Dr. Johnson assigned light duty restrictions to plaintiff. Dr. Johnson ordered x-rays of plaintiff's right shoulder and clavicle which were performed on May 3, 2005. The results of the shoulder x-ray revealed no focal bony lesion and bone mineralization was normal. The right clavicle x-ray also revealed no focal bony lesion, and bone mineralization was normal.
5. On May 6, 2005, plaintiff returned to Dr. Johnson's office with complaints of continued pain in her shoulder. However, she reported that the pain had changed somewhat. Initially the pain was in her axilla, and there was tenderness over the AC joint. While the tenderness over the AC joint remained, plaintiff was experiencing a burning sensation from C7 over the top of her scapula and into her upper arm. The ibuprofen she was taking helped, but her symptoms had not resolved. Plaintiff did not feel she was ready to return to full duty work because of the pain. She was still using a sling to support her arm. Dr. Johnson then referred *Page 4 
plaintiff to Dr. George Aiken, an orthopedist, for further evaluation. In the referral form to Dr. Aiken, Dr. Johnson indicated that plaintiff was "lifting box weighing 30-40 lbs over head and heard/felt right shoulder pop . . ." Plaintiff was restricted to light duty work until the evaluation.
6. On May 10, 2005, plaintiff was examined by Dr. Michael Zilles, a colleague of Dr. Aiken, of Duke University Medical Center's Division of Orthopaedics. She complained of pain over the distal clavicle with some swelling over the sternoclavicular joint. Plaintiff reported that the pain began after "overhead lifting 30 pound pallets and boxes." After a physical exam, Dr. Zilles recommended physical therapy, a home exercise program, and he administered a cortisone injection into the shoulder. Plaintiff was continued on light duty work. Upon exam on May 24, 2005, plaintiff complained of shoulder pain that was worse with abduction beyond ninety degrees. Dr. Zilles suspected a rotator cuff or labral tear. He noted that she was "status-post a lifting/pushing injury at work." Dr. Zilles ordered a right shoulder MRI and arthrogram, and he noted that she might be a candidate for arthroscopy. On June 27, 2005, the MRI and arthrogram revealed a prominent middle glenohumeral ligament adjacent to the anterior labrum limiting evaluation of this region. Mild injury to the anterior labrum could not be completely excluded.
7. Pursuant Dr. Zilles' recommendation on July 22, 2005, plaintiff underwent shoulder arthroscopy, labral repair, subacromial bursectomy, and decompression performed at Person Memorial Hospital. She was out of work from July 22, 2005 through August 7, 2005, but thereafter returned to work earning the same wages as before the injury. On August 30, 2005, plaintiff returned to Dr. Zilles' office. Plaintiff was referred for physical therapy.
8. In late November 2005, plaintiff voluntarily resigned from her job with defendant to take another job as a truck driver for a casino in New York. *Page 5 
9. Plaintiff testified that on April 28, 2005, she went to pull an order from a box of jackets in the overflow area of defendant's warehouse. The boxes of jackets were stacked several feet high. She reached up, grabbed a box that was above shoulder level, pushed it off, and knocked it to the floor. She removed the coat from the box, closed the box, and then attempted to return the box. When she did so, the box hit another box that was behind it and came back down. Plaintiff claims that she moved her head to the left and used her right arm to shield her face from the falling box. The box hit the palm of her hand, her right arm went back, and the box then struck the ground. The Commission finds that this description contradicts plaintiff's earlier reports of how the alleged incident occurred.
10. On the day the alleged incident occurred, plaintiff told her immediate supervisor, Lisa Poole, and the Human Resources Manager, Mindy Satterfield, that she picked up a box, extended her arms to put the box on top of a pallet, and she felt a pop. Plaintiff signed an Accident Investigation Report to that same effect the same day. When plaintiff treated with Dr. Johnson at Caswell Family Medical Center on the date after the incident, she told Dr. Johnson that she was putting a box on a pallet when she felt her right arm pop. During her recorded statement to Karen Beam of Key Risk Insurance Company on May 9, 2005, plaintiff stated that she was putting a box back on top of a pallet when she felt something in her right arm. When plaintiff began treating with Dr. Zilles, she reported that she experienced pain after performing overhead lifting of boxes weighing 30 pounds. Plaintiff never indicated to Ms. Poole, Ms. Satterfield, Dr. Johnson, or Ms. Beam that the box had fallen, thereby injuring her right shoulder. Dr. Zilles' medical records do not reflect any mention of the box falling and striking plaintiff.
11. The compensability of plaintiff's claim was formally denied by defendants by a Form 61 dated May 9, 2005, and plaintiff was made aware of the denial. *Page 6 
12. On June 9, 2005, plaintiff applied for health insurance which went into effect in early July 2005. Due to plaintiff's shoulder condition being a pre-existing condition at the time plaintiff applied for health insurance, the shoulder surgery would not have been covered. Ms. Satterfield testified that she had conversations with plaintiff prior to the time that the health insurance became effective, and she explained to plaintiff that the shoulder surgery would not be covered because it involved a pre-existing condition. The undersigned hereby find that the testimony of Ms. Satterfield is credible.
13. Both Barbara Parker, Vice President of Operations for defendant and Ms. Satterfield testified that a meeting was held with plaintiff on July 19, 2005. By that time, plaintiff's workers' compensation had been denied, Dr. Zilles had already recommended shoulder surgery, and plaintiff had learned that her health insurance would not pay for the surgery because it involved a pre-existing condition. The meeting was held to discuss the surgery, the length of time plaintiff would be out of work, medical leave and/or FMLA, and light duty work that would be available for her after she returned to work. Ms. Satterfield testified that during that meeting, plaintiff stated, "After mediation or a hearing, my claim will be paid for, because I did not state it correctly to be covered under workman's comp." Ms. Parker confirmed during her hearing testimony that plaintiff made this statement. The undersigned find that the testimony of both Ms. Satterfield and Ms. Parker is credible.
14. The Undersigned find that plaintiff's hearing testimony regarding how the incident occurred is not credible. Plaintiff changed the description of the alleged accident in hopes that the incident would qualify as an accident. Plaintiff testified that how often she worked in the overflow section of the warehouse varied depending on whether she was pulling orders or putting up orders. During her recorded statement, plaintiff testified that she was *Page 7 
performing her normal work at the time of the incident, and she was doing what she did "all the time." The overwhelming credible evidence of record reveals that on the date of the incident, the boxes were stacked the same way and at the same height as they always had been. Both Ms. Satterfield and Ms. Poole testified and the Undersigned find that boxes were always stacked six to seven feet high in the warehouse, and they were stacked even higher in the overflow section. There was nothing unusual about the way or how high the boxes were stacked in the warehouse on April 28, 2005.
15. After returning to work, defendant accommodated plaintiff's initial restrictions. She continued to work for defendant until she voluntarily resigned from her employment in November 2005. Plaintiff admitted during her hearing testimony that there was no indication that her job was going to end or that she was going to be terminated at the time of her resignation. Plaintiff's resignation was in no way related to her workers' compensation claim. Had plaintiff never resigned, she would have continued to work for defendant.
16. At the time of the hearing before the deputy commissioner, plaintiff was employed by SSS Exterior Home Designs installing vinyl siding. Plaintiff has been constantly employed since the date of the incident with the exception of the period between July 22, 2005 and August 7, 2005 when she was recovering from shoulder surgery.
 * * * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. A compensable injury must result from an accident, which is to be considered as a separate event preceding and causing the injury. The mere fact of any injury does not itself establish the fact of accident.Bigelow v. Tire Sales Co., 12 N.C. App. 220, 182 S.E.2d 856 *Page 8 
(1971). The term "accident" as used in the Act is defined as an unlooked for and untoward event which is not expected or designed by the injured employee. An accident results from a fortuitous cause and involves the interruption of the work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences. Harding v.Thomas Howard Co., 256 N.C. 427, 124 S.E.2d 109 (1962). No matter how great the injury, if it is caused by an event that involves both an employee's normal work routine and normal working conditions, it will not be considered to have been caused by accident. King v. ExxonCo., 46 N.C. App. 22, 264 S.E.2d 360 (1980).
2. Plaintiff was performing her normal work under normal working conditions at the time that she heard and felt the pop in her right shoulder and experienced the onset of shoulder pain. There was no interruption of her work routine that would qualify the incident as an injury by accident. N.C. Gen. Stat. § 97-2(6).
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for indemnity compensation is hereby DENIED.
2. Plaintiff's claim for medical compensation is hereby DENIED.
3. Defendants shall bear the costs.
This the 1st day of October, 2007.
 S/______________________
 BUCK LATTIMORE
 COMMISSIONER *Page 9 
CONCURRING:
 S/______________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ DANNY L. McDONALD COMMISSIONER *Page 1